**UNITED STATES DISTRICT COURT**
**IN THE DISTRICT OF SOUTH CAROLINA**
**SPARTANBURG DIVISION**

| | |
|---|---|
| MICHAEL J. PAULING and<br> RAMONA CESAREO-PAULING,<br><br>          Plaintiff,<br><br>vs.<br><br><br>IDELIVERTL, LLC; Isom Freight<br>Lines, LLC; and Sammie Lee McCloud<br><br>          Defendants. | **COMPLAINT**<br>**(JURY TRIAL REQUESTED)** |

The Plaintiff would respectfully show unto the Court that:

1.      The Plaintiffs are citizens and residents of Atlanta, Georgia, and at all times relevant to this Complaint were lawfully married as husband and wife.

2.      Upon information and belief, the Defendant IDELIVERTL, LLC ("IDELIVERTL") is a limited liability company organized under the laws of the State of South Carolina, with its principal place of business in any state in which a member resides.  Upon information and belief, IDELIVERTL is composed of two members:  1) Antoinette Godfrey, residing in Fort Mill, South Carolina, and, 2) Vincent J. Jacobs, a resident of York County, South Carolina.  IDELIVERTL is a commercial motor carrier bearing USDOT number 2097913 and is MC-Number 962181.

3.      Upon information and belief, the Defendant Isom Freight Lines, LLC ("Isom") is a limited liability company organized under the laws of the State of South Carolina, with its principal place of business in any state in which a member resides.  Upon information and belief, Isom is composed of one member:  Tony Isom, a resident of York County, South Carolina.  Isom maintains a registered agent for the service of process in Tony Isom, 347 Anvil Draw Pl., Rock

Hill, South Carolina 29730.  Upon information and belief, Isom is not does not have a USDOT number and does not have authority to operate commercial motor vehicles in interstate commerce.

4.      Upon information and belief Defendant SAMMIE LEE MCCLOUD ("MCCLOUD") is resident of York County, South Carolina, and possesses a commercial driver's license issued by the State of South Carolina.

5.      The wreck that is the subject of this Complaint occurred in Spartanburg County, State of South Carolina on or about February 13, 2018.

6.      The United States District Court for the District of South Carolina possesses jurisdiction over this matter pursuant to 28 U.S.C. § 1332, as the parties are completely diverse and the amount in controversy exceeds $75,000.00.

7.      Venue is appropriate in the Spartanburg Division of the District Court of South Carolina pursuant to 28 U.S.C. § 1391 and Local Civil Rule 3.01 DSC because a substantial part of the events or omissions giving rise to the claim occurred within the Spartanburg Division of the District of South Carolina.

8.      On February 13, 2018, the Defendant MCCLOUD was operating a commercial motor vehicle traveling north on I-85 in Spartanburg County, South Carolina, when as a result of a mechanical failure or failures, the vehicle suffered disabling damage causing it to come to a stop or near stop in the travelled portion of I-85.

9.      The commercial motor vehicle truck tractor being operated by the Defendant MCCLOUD was a 2012 International bearing VIN 3HSDJSJR6CN655421 ("the Defendants' Vehicle").  The Defendants' Vehicle was owned by Defendant Isom, but was leased to and/or operating under the authority of Defendant IDELIVERTL.

10.     After the Defendants' Vehicle suffered a disabling mechanical failure, MCCLOUD chose to slow and/or stop his commercial motor vehicle in the travel lane of I-85 despite sufficient room to pull his vehicle completely off the road on either sides of the roadway.

11.     Plaintiff was also traveling north on I-85 in a lawful manner.

12.     A pickup truck towing a trailer ("the Pick Up Truck") was directly in front of Plaintiff's vehicle.

13.     A tractor trailer combination ("the Penske Truck") was in front of the Pick Up Truck.

14.     The Penske Truck was directly behind the Defendants' Vehicle. The Pick-Up was directly behind the Penske Truck.  Plaintiff's vehicle was directly behind the Pick-Up.

15.     The acts and omissions of MCCLOUD in suddenly slowing or coming to a stop on the traveled portion of I-85 created an unsafe and dangerous hazard to following motorists, caused the Penske Truck to suddenly apply its brakes, and the Pick-Up to suddenly swerve into a construction zone to avoid a collision.

16.     The hazard created by MCCLOUD'S conduct and the unsafe and dangerously slowed or stopped Defendants' vehicle was not visible to Plaintiff until it was too late to avoid colliding with the rear of the Penske Truck.

17.     As a result of the collision, the Plaintiff Michael Pauling suffered the following injuries and damages: a) extensive pain, mental anguish, suffering and discomfort; b) disability for a period of time; c) money spent for medical care and treatment; d) inability to carry on normal activities; e) permanent injuries and disability; f) emotional trauma and distress; g) loss of enjoyment of life; and, h) time and wages lost from his job. As a result of the collision and the

resulting injuries to Michael Pauling, the Plaintiff Ramona Cesareo-Pauling suffered loss of consortium damages.

**FOR A FIRST CAUSE OF ACTION AGAINST DEFENDANT MCCLOUD**

18.    At all times relevant to this Complaint, Defendant MCCLOUD was operating a commercial motor vehicle transporting property in interstate commerce.

19.    In order to undertake such actions, the Defendant MCCLOUD is required to have, at a minimum, the knowledge and skills necessary for the safe operation of the commercial motor vehicle.

20.    The safe operation of commercial motor vehicles requires specialized knowledge and additional training not necessary for the safe operation of passenger vehicles because:

      a.    commercial motor vehicles are heavier than passenger vehicles and take longer to stop, as compared to a passenger car operating at the same prebraking speed;

      b.    commercial motor vehicles are heavier and longer than passenger vehicles and take longer to execute turning and lane change maneuvers, and take more room to enter traffic, as compared to passenger vehicles operating at the same pre-turn or lane change speed;

      c.    commercial motor vehicles are heavier than passenger vehicles and cause more significant property damage and/or personal injury or death in collisions, as compared to passenger cars operating at the same precollision speed and trajectory; and,

      d.    commercial motor vehicles pose more of a risk of causing personal injury, death, or property damage in a collision, as compared to a collision

involving a passenger vehicle operating at the same-pre-collision speed and trajectory.

21.    In order to undertake the safe operation of a commercial motor vehicle, drivers such as the Defendant MCCLOUD must have knowledge and skills in many areas, including the following:

    a.    motor vehicle inspection, repair, and maintenance requirements;

    b.    the principles and procedures for proper communications and the hazards of failing to signal properly, including communicating presence and using lights to signal presence;

    c.    the basic information concerning when and how to make emergency maneuvers, including emergency stops;

    d.    the objectives and proper procedures for performing vehicle safety inspections, including the importance of periodic inspection and repair to vehicle safety, the effect of undiscovered malfunctions upon safety; and what safety-related parts to look for when inspecting vehicles; and,

    e.    basic pretrip inspection skills for the vehicle class that he operates.

22.    In addition to the basic knowledge and skills required of commercial motor vehicle drivers, it is standard in the industry for drivers to inspect power steering hoses, pumps, and fluid level, and to make necessary repairs before operating the vehicle.

23.    In addition to the basic knowledge and skills required of commercial motor vehicle drivers, it is standard in the industry for drivers to check the engine compartment for engine oil level, coolant level and the condition of coolant hoses, power steering fluid levels and hose condition, and leaks in the engine compartment.

24.     In addition to the basic knowledge and skills required of commercial motor vehicle drivers, it is standard in the industry for drivers to inspect the rear of their vehicles for the following:  that the rear clearance and identification lights are clean, operating, and the proper color; reflectors are clean and proper color; taillights are clean, operating, and the proper color; right rear turn signals are operating and the proper color.

25.     In addition to the basic knowledge and skills required of commercial motor vehicle drivers, it is standard in the industry for drivers to check for bad brake drums and shoes, including cracked drums; shoes or pads with oil, grease, or brake fluid on them; or shoes worn dangerously thin, missing, or broken.

26.     In addition to the basic knowledge and skills required of commercial motor vehicle drivers, it is standard in the industry for drivers to do the following during a trip:  watch gauges for signs of trouble; use your senses to check for problems (look, listen, smell, feel); check critical systems when you stop, including tires, wheels and rims, brakes, lights and reflectors, brake and electrical connections to trailer, and trailer coupling devices)

27.     The injuries and damages incurred by the Plaintiff were directly and proximately caused by  MCCLOUD's careless, negligent, grossly negligent, willful, wanton, reckless, and unlawful acts in one or more of the following particulars:

        a.     in failing to have the required knowledge and skill regarding motor vehicle inspection, repair, and maintenance requirements;

        b.     in failing to signal properly, including failing to communicate presence or failing to use lights to signal presence;

c.    in failing to have the required knowledge and skill regarding the basic information concerning when and how to make emergency maneuvers, including emergency stops;

d.    in failing to have the required knowledge and skill regarding the objectives and proper procedures for performing vehicle safety inspections, including the importance of periodic inspection and repair to vehicle safety, the effect of undiscovered malfunctions upon safety; and what safety-related parts to look for when inspecting vehicles; and,

e.    in failing to have the required knowledge and skill regarding basic pretrip inspection skills for the vehicle class that he operates;

f.    In operating a commercial motor vehicle when the condition of the vehicle rendered it a defective dangerous hazard, including operating a vehicle without proper brakes, brake adjustments, brake lines, hoses, couplings;

g.    in failing to immediately activate his hazard warning signal flashers;

h.    in failing to move his vehicle from the travel lanes of I-85; and,

i.    in operating a vehicle with defective and dangerous brakes.

28.    The Defendant MCCLOUD's careless, negligent, willful, wanton, reckless and unlawful acts were the direct and proximate cause of the collision and resulting injuries and damages to Plaintiff

**FOR A SECOND CAUSE OF ACTION, AGAINST DEFENDANTS IDELIVERTL AND/OR ISOM**

29.    Plaintiff repeats and realleges paragraphs 1-28 as if verbatim.

7

30.     At all times relevant to the allegations contained in this Complaint, the Defendant MCCLOUD was working in the course and scope of his employment for the Defendant IDELIVERTL and/or Isom, or was otherwise acting as an agent or servant of the IDELIVERTL and/or Isom.

31.     The Defendant IDELIVERTL and/or Isom is liable for the acts and omissions of the Defendant MCCLOUD under the doctrines of respondeat superior, master/servant, and/or agent/principal.

32.     At all times relevant to this Complaint the Defendant MCCLOUD was operating a commercial motor vehicle in intrastate or interstate commerce under the USDOT authority granted to IDELIVERTL.

33.     Defendant IDELIVERTL is liable for the acts and omissions of Defendant MCCLOUD while he was operating under its authority by virtue of the Federal Motor Carrier Safety Regulations.

34.     The Plaintiff is informed and believes that he is entitled to judgment against the Defendant IDELIVERTL and/or Isom for actual and punitive damages in an appropriate amount.

**FOR A THIRD CAUSE OF ACTION, AGAIST DEFENDANT IDELIVERTL**

35.     Plaintiff repeats and realleges as if verbatim paragraphs 1-34.

36.     The Defendant IDELIVERTL operates as a commercial motor carrier.

37.     In return for the privilege to operate commercial motor vehicles on the public roadways, prospective motor carriers must make certain safety related certifications and verifications.

38.     Motor carriers such as Defendant IDELIVERTL are required to submit a Form MCS- 150 to the Federal Motor Carrier Administration and obtain an USDOT number and at least on a biennial basis thereafter.

39.     Each Form MCS-150 IDELIVERTL submitted or will submit contains a Certification Statement whereby IDELIVERTL declares under the penalty of perjury that it is familiar with the Federal Motor Carrier Safety Regulations and/or Federal Hazardous Materials Regulations.

40.     Motor Carriers such as Defendant IDELIVERTL are required to submit a Form OP-l to the Federal Motor Carrier Administration in order to gain authorization to operate as a for hire motor carrier transporting goods or property in interstate commerce.

41.      The Form OP-l submitted by Defendant IDELIVERTL contains a "Safety Certification", certifying to the Federal Motor Carrier Safety Administration that they are subject to the pertinent portions of the U.S. DOT's Federal Motor Carrier Safety Regulations ("FMCSR") at 49 CFR, Chapter 3, Subchapter B (Parts 350-399).

42.     The Form OP-l submitted by Defendant IDELIVERTL contains a "Safety Certification", certifying to the Federal Motor Carrier Safety Administration that they have access to and are familiar with all applicable U.S. DOT regulations relating to the safe operation of commercial vehicles and that they will comply with the regulations.

43.     Each Form OP-l submitted by Defendant IDELIVERTL contains a "Safety Certification", certifying to the Federal Motor Carrier Safety Administration that, at a minimum, they:

              a.     have in place a system and an individual responsible for ensuring overall compliance with the FMCSR;

9

b.    Can produce a copy of the FMCSR;

c.    have in place a driver safety training/orientation program;

d.    are familiar with DOT regulations governing driver qualifications and have in place a system for overseeing driver qualification requirements (49 CFR Parts 391); and,

e.    have in place policies and procedures consistent with DOT regulations governing driving and operational safety of motor vehicles, including vehicle inspection, repair and maintenance.

44.    Reasonably safe motor carriers develop and implement policies, practices, and procedures to give effect to the minimum safety standards contained in the Federal Motor Carrier Safety Regulations to reduce or eliminate preventable collisions that may cause injury, death, or property damage on the public roadways.

45.    Reasonably safe motor carriers train and educate drivers operating under their authority regarding the safe operation of commercial motor vehicles.

46.    Reasonably safe motor carriers utilize information and training materials from industry associations and third party safety vendors such as J.J. Keller & Associates, Inc., the "Smith System," Pro-Tread, and/or the National Safety Council to train and educate their drivers regarding the safe operation of commercial motor vehicles.

47.    The safe operation of commercial motor vehicles includes practices and procedures related to speed management, space management, seeing ahead, total stopping distance, pretrip inspections, vehicle inspections, seeing hazards, and emergency maneuvers.

48.    Reasonably safe motor carriers utilize publicly available government, industry, and trade publications regarding the preventability of highway collisions to design, develop, and

implement safety management controls which are designed to reduce collisions involving commercial motor vehicles.

49.    Motor carriers should never allow or permit a driver to operate their commercial motor vehicles if the driver does not have the required knowledge or skill to safely operate the vehicle.

50.    To be qualified to operate a commercial motor vehicle, a driver must have experience and/or training to safely operate the type of vehicle; must be physically qualified; must have a currently valid CDL, and must furnish the motor carrier a list of current driving violations.

51.    To operate a commercial motor vehicle under IDELIVERTL's operating authority, the prospective driver is required to complete a written application containing the following information:

    a.    the nature and extent of the driver's experience;

    b.    a list of all accidents in the previous 3 years;

    c.    a list of all violations of motor vehicle laws in the previous 3 years;

    d.    a detailed description of any denial, revocation, or suspension of any drivers licenses or permits;

    e.    employment information for the previous 3 years; and,

    f.    the names of all employers for whom the driver has operated a commercial motor vehicle for the previous 7 years.

52.    Before a motor carrier such as Defendant IDELIVERTL may allow or permit a driver to operate a commercial motor vehicle under its operating authority, the motor carrier must:

a.    obtain the driver's motor vehicle record from the applicable state agency for the previous 3 years; and,

b.    investigate the driver's safety performance history with all DOT regulated employers for the previous 3 years;

53.    Once a motor carrier such as Defendant IDELIVERTL hires a commercial driver, every twelve months thereafter the driver must submit a written list of all traffic violations the driver received in those twelve months.

54.    Once a motor carrier such as Defendant IDELIVERTL hires a commercial driver, every twelve months thereafter the motor carrier must obtain from the relevant state agency a list of traffic violations for the previous year and maintain a copy of the record in the driver's qualification file.

55.    Motor carriers such as IDELIVERTL are required to maintain a Driver Qualification File meeting the requirements of 49 CFR § 391.51 for the duration of the driver's employment with the motor carrier plus three years.

56.    Motor carriers should never allow or permit a driver to operate their commercial motor vehicles if the driver does not have the required knowledge or skill to safely operate the vehicle.

57.    It is standard in the industry for careful motor carriers to regularly check their Safety Measurement System details.

58.    The FMCSA's Safety Measurement System (SMS) provides an assessment of a motor carrier's on-road performance results within seven safety related categories.  Motor carriers are scored on a percentile basis as compared to other similar carriers.

59. It is standard in the industry for motor carriers to regularly monitor their SMS scores and to address any areas of noncompliance before they lead to collisions.

60. Prior to the date of the collision that is the subject of this litigation, the Defendant IDELIVERTL's publicly available compliance history demonstrated a custom and pattern of operating unsafe vehicles on the public roadways, including violations for improper, out of service, and non-functioning brake systems.

61. IDELIVERTL'S history of USDOT inspections also demonstrated that its vehicle out of service rate was above 50%, when the national average was 20%.

62. The injuries and damages incurred by the Plaintiff were directly and proximately caused by the Defendant IDELIVERTL's careless, negligent, grossly negligent, willful, wanton, reckless, and unlawful acts in one or more of the following particulars by failing to use reasonable care in the:

a.    failing to design, develop, and implement adequate safety management controls related to speed management, space management, seeing ahead, total stopping distance, pretrip inspections, vehicle inspections, seeing hazards, and emergency maneuvers, and vehicle maintenance.

b.    failing to train Defendant MCCLOUD regarding speed management, space management, seeing ahead, total stopping distance, pretrip inspections, vehicle inspections, seeing hazards, and emergency maneuvers, and vehicle maintenance.

c.    failing to properly monitor and supervise the driving habits of Defendant MCCLOUD;

d.      Supervision of its business operations in failing to properly monitor the driving habits and records of its drivers, employees, and/or agents, specifically the Defendant MCCLOUD;

e.      Supervision of its drivers, employees, and/or agents, specifically the Defendant MCCLOUD;

f.      Instruction of its drivers, employees, and/or agents, specifically the Defendant MCCLOUD;

g.      Entrustment of a tractor trailer to its drivers, employees, and/or agents, specifically the Defendant MCCLOUD;

h.      Compliance with federal and/or state regulations and industry standards, as referenced in this Complaint and as developed during the discovery in this case;

i.      In failing to have adequate safety management controls in place to ensure compliance with the required safety fitness standard;

j.      in failing to budget an appropriate amount of money to design, develop, and implement safety management controls in the areas of speed management, space management, seeing ahead, total stopping distance, pretrip inspections, vehicle inspections, seeing hazards, and emergency maneuvers, and vehicle maintenance; and,

k.      in operating a vehicle with defective, malfunctioning, and dangerous brakes and brake systems.

63.     The Defendant IDELIVERTL's careless, negligent, willful, wanton, reckless and unlawful acts were the direct and proximate cause of the collision and resulting injuries and damages to the Plaintiff.

**FOR A FOURTH CAUSE OF ACTION**
**(Against IDELIVERTL and/or Isom)**

64.     Plaintiff repeats and realleges as if verbatim Paragraphs 1-63.

65.     Defendants IDELIVERTL and/or Isom had the duty and obligation to maintain, inspect, service, and repair the Defendants' Vehicle, including its brake, brake lines, and brake system.

66.     The injuries and damages incurred by the Plaintiff were directly and proximately caused by the Defendant IDELIVERTL and/or Isom's careless, negligent, grossly negligent, willful, wanton, reckless, and unlawful acts in one or more of the following particulars by failing to use reasonable care in the:

        a.     inspection, repair, and maintenance of the Defendants' Vehicle, including but not limited to the brakes and brake systems; and,

        b.     allowing or permitting the Defendants' Vehicle to operate on the public roadways when it was not mechanically safe to do so;

67.     The Defendant IDELIVERTL's careless, negligent, willful, wanton, reckless and unlawful acts were the direct and proximate cause of the collision and resulting injuries and damages to the Plaintiff.

(REMAINDER OF PAGE INTENTIONALLY BLANK)

**WHEREFORE,** the Plaintiffs pray for judgment against the Defendants for actual and punitive damages in an appropriate amount to be determined at trial in excess of $75,000.00, the costs of this action, and for such other and further relief as the Court may deem just and proper.

*s/ William H. McAngus, Jr.*
William H. McAngus, Jr. (Fed. ID 9874)
Chappell Smith & Arden
Post Office Box 12330
Columbia, South Carolina 29211
(803) 929-3600
(803) 929-3604 (FAX)
hmcangus@csa-law.com

Attorneys for Plaintiffs

January 23, 2019

16